UNITED STATES DISTRICT COURT                    **(ECF)**
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
DOUGLAS HOWARD,                      : 12 Civ. 0933 (JMF) (JCF)
                                     :
              Plaintiff,             :        REPORT AND
                                     :        <u>RECOMMENDATION</u>
     - against -                     :
                                     :
CITY OF NEW YORK, KIEISHSHA Y.       :
GARNES, ADRIAN BENEPE, and SHERRI    :
ROSENBERG,                           :
                                     :
              Defendants.            :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE JESSE M. FURMAN, U.S.D.J.:

     Douglas Howard brings this action against the City of New York

(the "City"), Deputy General Counsel Sherri Rosenberg of the New

York City Parks and Recreation Department (the "Parks Department"),

and the Parks Department Manager at the East River Park, Kieishsha

Garnes   (collectively,   the   "defendants"),[1]   alleging   racial

discrimination and retaliation under 42 U.S.C. §§ 1981 and 1983.

The defendants move for summary judgement under Rule 56 of the

Federal Rules of Civil Procedure.  For the reasons discussed, I

recommend that the motion be granted.

<u>Background</u>

     Except as otherwise noted, the following material facts are

undisputed and drawn from the parties' declarations and statements

filed in accordance with Rule 56.1 of the Local Civil Rules of the

United States District Courts of the Southern and Eastern Districts

---

[1] The plaintiff has withdrawn his claims against former Parks
Department Commissioner Adrian Benepe.  (Memorandum of Law in
Opposition to Defendants' Motion for Summary Judgment ("Pl. Memo.")
at 3).

of New York ("Local Civil Rules").

    A.   <u>The Permit</u>

On June 20, 2008, Mr. Howard, a white male, was awarded a permit by the Parks Department to operate a tennis concession at East River Park (the "Park"). (Defendants' Statement of Material and Undisputed Facts Pursuant to Local Rule 56.1 ("Def. Rule 56.1 Statement"), ¶¶ 5-6; Plaintiff's Rule 56.1 Counterstatement ("Pl. Rule 56.1 Statement"), ¶¶ 5-6; City of New York Department of Parks & Recreation - Revenue Division Permit dated June 20, 2008 ("Permit"), attached as Exh. B to Declaration of Gloria M. Yi dated April 15, 2013 ("Yi Decl.")). The permit granted the plaintiff the exclusive right to provide tennis lessons for a fee at the Park from July 3, 2008 until November 21, 2010, covering three tennis seasons. (Def. Rule 56.1 Statement, ¶¶ 8-9; Pl. Rule 56.1 Statement, ¶¶ 8-9). Don Sylva had been the previous tennis professional at the Park. (Def. Rule 56.1 Statement, ¶ 7; Pl. Rule 56.1 Statement, ¶ 7).

Defendant Kieishsha Garnes was the Manager at the Park and was responsible for overseeing its maintenance and operation and managing its employees. (Def. Rule 56.1 Statement, ¶ 12; Pl. Rule 56.1 Statement, ¶ 12). She did not have any specific duty with respect to the twelve tennis courts at the Park. (Def. Rule 56.1 Statement, ¶ 13; Pl. Rule 56.1 Statement, ¶ 13). Rather, the tennis attendants employed by the Parks Department were responsible for the daily operation of the courts. (Def. Rule 56.1 Statement, ¶ 13; Pl. Rule 56.1 Statement, ¶ 13). In 2008 and 2009, the Park

tennis attendants were Ana Velez, Heriberto Torres, and Maria Medina. (Def. Rule 56.1 Statement, ¶ 13; Pl. Rule 56.1 Statement, ¶ 13).

### B.   Operation of the Permit

The plaintiff started operating under the permit in July 2008. (Def. Rule 56.1 Statement, ¶ 15; Pl. Rule 56.1 Statement, ¶ 15). According to Mr. Howard, he was subjected to discriminatory treatment from "the moment [he] started." (Def. Rule 56.1 Statement, ¶ 16; Pl. Rule 56.1 Statement, ¶ 16).

### 1.   Assignment of Tennis Court

Mr. Howard claims that he encountered difficulties reserving a tennis court and that the Park employees did not inform him that he could reserve a court by appearing five minutes before the hour. (Def. Rule 56.1 Statement, ¶ 18; Pl. Rule 56.1 Statement, ¶ 18; Deposition of Douglas Howard dated Jan. 24, 2013 ("Howard Dep."), attached as Exh. D to Declaration of Michael G. O'Neill dated May 9, 2013 ("O'Neill Decl."), at 23-26). The permit provides that the "Permittee shall provide and conspicuously post an appointment sign up sheet in a location approved by [the] Parks [Department]. All appointments must be reserved at least one day in advance." (Def. Rule 56.1 Statement, ¶ 19; Permit, ¶ 7).

Mr. Howard sought to have tennis court # 1 assigned to him and be allowed to reserve the court by appearing five minutes before the hour as allegedly had been the case for the prior tennis instructor. (E-mail of Douglas Howard dated Jan. 23, 2009, attached as part of Exh. L to Yi Decl., ¶¶ 2, 4; E-mail of Douglas

Howard dated July 14, 2008, attached as part of Exh. A to O'Neill Decl.).  The Parks Department agreed and requested that he arrive "at least 5 minutes before the court is scheduled for a lesson." (Letter of Robert Garafola dated Feb. 23, 2009, attached as part of Exh. M to Yi Decl.).  In response, the plaintiff claimed that "[t]here is no scheduling to be done between [him] and the [P]ark." (E-mail of Douglas Howard dated March 31, 2009 ("03/31/09 Howard E-mail"), attached as part of Exh. L to Yi Decl., ¶ 9).

   2.   <u>Unauthorized Tennis Teachers</u>

Soon after Mr. Howard began operating his tennis concession, he wrote to various Parks Department officials complaining about the presence of unauthorized tennis instructors, including one whom he identified as Carlos Ruiz, also known as Alex Ruiz.  (Def. Rule 56.1 Statement, ¶¶ 20, 22; Pl. Rule 56.1 Statement, ¶¶ 20, 22; E-mail of Douglas Howard dated Sept. 16, 2008, attached as part of Exh. J to Yi Decl.).  The plaintiff requested that the Parks Department either revoke the unauthorized instructors' tennis privileges or allow the plaintiff to call the police.  (E-mail of Douglas Howard dated Oct. 23, 2008 ("10/23/08 Howard E-mail"), attached as part of Exh. J to Yi Decl., ¶ 3; E-mail of Douglas Howard dated Oct. 31, 2008 ("10/31/08 Howard E-mail"), attached as part of Exh. J to Yi Decl., ¶ 4).  He wrote that "Carlos" was an "illegal teacher" whom he "hoped . . . would make physical contact with [him]."  (10/23/08 Howard E-mail, ¶ 5.2; 10/31/08 Howard E-mail, ¶ 6.1).

The permit states that the "Parks [Department] does not

4

guarantee that illegal vendors or persons unauthorized by [the] Parks [Department] will not compete with Permittee near the premises." (Def. Rule 56.1 Statement, ¶ 8; Pl. Rule 56.1 Statement, ¶ 8; Permit, ¶ 31).

Namshik Yoon, the Parks Department's Chief Operating Officer, discussed the issue of unauthorized instructors with Ms. Garnes. (Def. Rule 56.1 Statement, ¶¶ 14, 37; Pl. Rule 56.1 Statement, ¶¶ 14, 37; Deposition of Namshik Yoon dated Feb. 28, 2013 ("Yoon Dep."), attached as Exh. H to O'Neill Decl., at 6-7, 36-38). Ms. Garnes and her staff went to tennis courts at the Park to determine whether unauthorized individuals were providing lessons. (Def. Rule 56.1 Statement, ¶ 37; Pl. Rule 56.1 Statement, ¶ 37; Deposition of Kieishsha Garnes dated Feb. 20, 2013 ("Garnes Dep."), attached as Exh. F to O'Neill Decl., at 37-39). Tennis attendants were also instructed to call their supervisor and the Parks Department Enforcement Patrol if they witnessed any person providing unauthorized lessons. (Def. Rule 56.1 Statement, ¶ 37; Pl. Rule 56.1 Statement, ¶ 37; Deposition of Charles Kloth dated Feb. 14, 2013 ("Kloth Dep."), attached as Exh. G to O'Neill Decl., at 64-65; Yoon Dep. at 79-80). In the absence of witnessing an exchange of money, the Parks Department would not conclude that an individual was an unlicensed instructor, and the tennis attendants reported that they had not witnessed any "illegal teachers." (Def. Rule 56.1 Statement, ¶ 37; Pl. Rule 56.1 Statement, ¶ 37; Garnes Dep. at 137, 153-54; Yoon Dep. at 80).

On May 13, 2009, Mr. Howard was involved in a physical

altercation with Mr. Ruiz at the Park tennis courts which resulted in the arrest of both of them. (Def. Rule 56.1 Statement, ¶ 48; Pl. Rule 56.1 Statement, ¶ 48). According to Charles Kloth, the Parks Department's Director of Concessions, the confrontation occurred either because Mr. Ruiz was giving unauthorized tennis lessons or because the plaintiff believed that he was. (Def. Rule 56.1 Statement, ¶¶ 11, 49; Pl. Rule 56.1 Statement, ¶¶ 11, 49; Kloth Dep. at 5, 47).

### 3.   Storage

Another condition that the plaintiff found problematic was the lack of suitable storage at the Park for his tennis ball basket. (Def. Rule 56.1 Statement, ¶ 27; Pl. Rule 56.1 Statement, ¶ 27). The permit provides that "[u]nless Permittee is specifically authorized in writing to use a Parks[] [Department] building or facility, Permittee shall not store any equipment or supplies on Parks[] [Department] property." (Def. Rule 56.1 Statement, ¶ 30; Pl. Rule 56.1 Statement, ¶ 30; Permit, ¶ 21).

The plaintiff sought permission to store his basket outdoors at the Park facility or to receive a key and store it inside the building. (Def. Rule 56.1 Statement, ¶ 27; Pl. Rule 56.1 Statement, ¶ 27; E-mail of Douglas Howard dated Oct. 16, 2008, attached as part of Exh. K to Yi Decl.; E-mail of Douglas Howard dated Oct. 13, 2008, attached as part of Exh. K to Yi Decl.). Ms. Garnes informed him that she could not give him a key to the facility. (Def. Rule 56.1 Statement, ¶¶ 28, 31; Pl. Rule 56.1 Statement, ¶ 28; E-mail of Kieishsha Garnes dated Oct. 14, 2008

6

("10/14/08 Garnes E-mail"), attached as part of Exh. K to Yi Decl.; Garnes Dep. at 134-35).[2]  His request to store his basket at the Park was also denied because of the Parks Department's general rule that members of the public are not allowed to store personal property at its facilities due to potential liability in the event of theft or vandalism.  (Def. Rule 56.1 Statement, ¶ 29; Garnes Dep. at 123-24, 127; Yoon Dep. at 27-28).[3]

Without permission to store his equipment elsewhere, Mr. Howard chained his basket to a radiator in the men's bathroom at the Park.  (Def. Rule 56.1 Statement, ¶ 32; Pl. Rule 56.1 Statement, ¶ 32).  He was told to remove it in December 2008 (Def. Rule 56.1 Statement, ¶ 32; Pl. Rule 56.1 Statement, ¶ 32; Howard Decl., ¶ 25), but did not do so until mid-February 2009.  (Def. Rule 56.1 Statement, ¶ 32; Pl. Rule 56.1 Statement, ¶ 32).

####     4.   Racial Comment

The plaintiff alleges that on October 12, 2008, tennis attendant Maria Medina stated, "We don't want your white ass here." (Def. Rule 56.1 Statement, ¶ 24; Pl. Rule 56.1 Statement, ¶ 24). Mr. Howard claims that after hearing this statement, he realized

---

[2] The plaintiff asserts that during a phone conversation he had with Ms. Garnes on June 24, 2008, she acknowledged that the prior instructor had a key to a storage room at the Park.  (Pl. Rule 56.1 Statement, ¶ 31; Declaration of Douglas Howard dated May 9, 2013 ("Howard Decl."), ¶ 20).  In an e-mail to Mr. Howard, Ms. Garnes stated that she was unaware of any such arrangement. (10/14/08 Garnes E-mail).

[3] Mr. Howard asserts that Ms. Garnes testified only that attendants were not able to give their own keys to the Park's facilities to members of the public.  (Pl. Rule 56.1 Statement, ¶ 29).

that the difficulties he was encountering at the Park were based on his race. (Def. Rule 56.1 Statement, ¶ 26; Howard Dep. at 52, 55-56, 62).

After Mr. Howard complained to Ms. Garnes about this alleged statement, she asked her staff if anyone had said anything to that effect. (Def. Rule 56.1 Statement, ¶ 36; Pl. Rule 56.1 Statement, ¶ 36, Garnes Dep. at 73). According to Ms. Garnes, her staff responded that they had not. (Garnes Dep. at 73). The plaintiff acknowledges that no other racial comments were made to him by employees of the Parks Department. (Def. Rule 56.1 Statement, ¶ 25; Pl. Rule 56.1 Statement, ¶ 25).

### 5. Postings

After the altercation in May, Mr. Ruiz found a posting on a board at the Park that he believed Mr. Howard had placed there. (Def. Rule 56.1 Statement, ¶ 55; Deposition of Carlos Alejandro Ruiz dated March 6, 2013 ("Ruiz Dep."), attached as Exh. V to Yi Decl., at 95-96; 1.33 pro-permit issues ("Posting"), attached as Exh. W to Yi Decl.). It stated that Mr. Ruiz was "a dangerous, desperate, unstable person who should not be having personal interactions with our tennis community," and that Ms. Medina was "motivated to invent stories about [the plaintiff] and maybe you, because she has previously stated that she does not want '[the plaintiff's] white ass' at the courts." (Posting).

Ms. Garnes testified that Ms. Medina complained to her about Mr. Howard's postings, and she recalled seeing them on the Parks' bulletin board and fence, although she could not remember their

content.  (Def. Rule 56.1 Statement, ¶ 55; Pl. Rule 56.1 Statement, ¶ 55; Garnes Dep. at 49-52).  She also reported to Parks Department officials that Mr. Ruiz had handed her some papers that he found posted at the tennis courts.  (E-mail of Kieishsha Garnes dated Aug. 3, 2009 ("08/03/09 Garnes E-mail"), attached as part of Exh. U to Yi Decl.).

According to the permit, "Any and all signage is subject to [the] Parks[] [Department's] approval."  (Def. Rule 56.1 Statement, ¶ 56; Pl. Rule 56.1 Statement, ¶56.1; Permit, ¶ 34).  Mr. Howard had not received approval to post any sign.  (Def. Rule 56.1 Statement, ¶ 56; Affidavit of Evan George dated Sept. 12, 2011 ("George Aff."), attached as Exh. Y to Yi Decl., ¶ 4).[4]

C.  Complaints of Racial Discrimination

Mr. Howard submitted a complaint of discrimination that was referred to the Parks Department's Equal Employment Opportunity ("EEO") Office.  (Def. Rule 56.1 Statement, ¶ 41; Pl. Rule 56.1 Statement, ¶ 41; Deposition of Evan George dated Feb. 19, 2013 ("George Dep."), attached as Exh. I to O'Neill Decl., at 20-21).[5]

---

[4] The plaintiff argues that the postings identified by Mr. Ruiz and Ms. Garnes are not "signs" and that because neither the Parks Department's Project Manager, Evan George, nor Mr. Kloth had personally seen the postings, their testimony that he had posted signs without approval should be disregarded.  (Def. Rule 56.1 Statement, ¶¶ 10, 56; Pl. Rule 56.1 Statement, ¶ 10).  He also implies that he was not warned against posting signs because the only "contemporaneous written communications concerning signage" consisted of e-mails in June 2008 when he requested to post a "new pro sign."  (Def. Rule 56.1 Statement, ¶ 56; E-mail chain between Douglas Howard and Kieishsha Garnes dated June 23, 2006, attached as part of Exh. A to O'Neill Decl.).

[5] While the defendants have not identified what complaint was forwarded to the EEO Office, based on the response by Ricardo

In the plaintiff's e-mail dated January 20, 2009, he alleges that in "2008-May or so," a staff meeting was held during which "probably [the] Manager told her employees to treat [him] badly" (01/20/09 Howard E-mail, ¶ 2.3) and that an "employee said to [him] 'We don't want your white ass here[,]'" which he understood to be a statement made on behalf of both the employee and Manager (01/20/09 Howard E-mail, ¶ 2.9). He also complains about various incidents where the "Manager" or her staff interrupted his lessons or closed the courts, required him to wait for a court to become available, would not provide him with a key to the Park facility, would not take action against "illegal teachers," stole an elastic exercise band, and delayed posting information about his tennis program. (01/20/09 Howard E-mail, ¶¶ 2.5-2.8, 2.10-2.12, 2.14-2.17). He contends that he reported "the racism" to the Parks Department's Permit Department, and it "had no relevant comment (01/20/09 Howard E-mail, ¶ 2.13), and that he confronted "the Manager," but she was "completely hostile" (01/20/09 Howard E-mail, ¶ 2.15). Mr. Granderson requested that the plaintiff provide him more specificity about the allegations in order to facilitate an

---

Granderson, the Director of the Parks Department's EEO Office, to the complaint, it appears to be the plaintiff's e-mail dated January 20, 2009, titled "racial discrimination and abuse against East River park tennis teaching program." (E-mail of Ricardo R. Granderson dated Feb. 2, 2009 ("02/02/09 Granderson E-mail"), attached as part of Exh. P to Yi. Decl. (referring to section two of Mr. Howard's complaint entitled "Fact Record of Racial Discrimination and Abuse"); E-mail of Douglas Howard dated Jan. 20, 2009 ("01/20/09 Howard E-mail") (section two titled "fact-record of racial discrimination and abuse"), attached as Exh. A to O'Neill Decl.; Def. Rule 56.1 Statement, ¶ 41; Pl. Rule 56.1 Statement, ¶ 41)

investigation, such as the name of "the Manager" and the person in the Permit Department to whom he reported these incidents, contact information of any witness, a copy of the "Teaching Program" he wanted posted, and any objective information related to "the illegals." (Def. Rule 56.1 Statement, ¶ 41; Pl. Rule 56.1 Statement, ¶ 41; Deposition of Ricardo Granderson dated Jan. 7, 2013 ("Granderson Dep."), attached as Exh. C to O'Neill Decl., at 27; 02/02/09 Granderson E-mail). Mr. Granderson also interviewed the employees of the Parks Department as part of his investigation. (Def. Rule 56.1 Statement, ¶ 41; Granderson Dep. at 27).[6]

The Parks Department's Advocate Office investigated Mr. Howard's discrimination complaint against Ms. Garnes and found no evidence of discrimination. (Def. Rule 56.1 Statement, ¶ 42; Pl. Rule 56.1 Statement, ¶ 42; Parks Advocate-Investigation Unit, Investigation Report dated Feb. 13, 2009 ("Advocate Office Investigation Report"), attached as Exh. Q to Yi Decl.).

On August 2, 2009, the plaintiff wrote an e-mail entitled "further racial discrimination against the East River Park tennis program and tennis public" to various Parks Department employees. (E-mail of Douglas Howard dated Aug. 2, 2009 ("08/02/09 Howard E-mail"), attached as part of Exh. U to Yi Decl.). He claimed that by permitting Mr. Ruiz to play in excess of the one-hour rule, the Parks Department is "further[ing] the illegal unqualified tennis-teaching business of a violence-perpetrator at the park, who [he]

---

[6] The plaintiff contends that no investigation was conducted by Mr. Granderson because the defendants have not produced any investigation file. (Pl. Rule 56.1 Statement, ¶ 41)

believes is a person of color ['POC'], with the effect . . . of harming nonPOCs' lives and safety." (Def. Rule 56.1 Statement, ¶ 50; Pl. Rule 56.1 Statement, ¶ 50; 08/02/09 Howard E-mail).

Mr. Granderson responded to the plaintiff's e-mail, stating that the EEO Office was "willing to entertain [his] concern[s] provided that they are within the scope of EEO and provided that [he] submit some minimal factual basis, other than conclusory declarations." (Def. Rule 56.1 Statement, ¶ 51; Pl. Rule 56.1 Statement, ¶ 51; E-mail of Ricardo Granderson dated Aug. 4, 2009, attached as part of Exh. U to Yi Decl.). The plaintiff responded that he had provided "extensive, clear detail" and that "no written reply from [Mr. Granderson] is requested or appropriate at this time." (Def. Rule 56.1 Statement, ¶ 52; Pl. Rule 56.1 Statement, ¶ 52; E-mail of Douglas Howard dated Aug. 5 2009 ("08/05/09 Howard E-mail"), attached as part of Exh. U to Yi Decl.).

On August 9, 2009, the plaintiff again wrote to various Parks Department employees complaining that Mr. Ruiz was permitted to play for more than one hour and that by allowing this the Parks Department was "discriminating in favor of persons of color, and discriminating against nonPOCs." (E-mail of Douglas Howard dated Aug. 9, 2009 ("08/09/09 Howard E-mail"), attached as part of Exh. U to Yi Decl.).

In a letter dated August 14, 2009, Mr. Granderson informed Mr. Howard that the EEO Office would not be conducting a review because he had not articulated any viable claim of discrimination. (Letter of Ricardo R. Granderson dated Aug. 14, 2009, attached as part of

12

Exh. P to Yi Decl.).

    D.   <u>Complaints by the Park Staff</u>

    Officials at the Parks Department received complaints that Mr. Howard was displaying aggressive and confrontational behavior towards the staff at the Park when he was asked to follow the rules. (Def. Rule 56.1 Statement, ¶ 57; Kloth Dep. at 36-37; George Aff., ¶ 6).[7] The Park attendants also stated that they felt harassed by Mr. Howard. (Def. Rule 56.1 Statement, ¶ 58; Pl. Rule 56.1 Statement, ¶ 58). According to Anna Velez, a tennis attendant at the Park, Mr. Howard "bothered the other people" and would start arguments, and "almost everybody who would come to play at the courts would complain about [him]." (Def. Rule 56.1 Statement, ¶ 59; Pl. Rule 56.1 Statement, ¶ 59).

    On August 18, 2009, Ms. Garnes reported an incident in which Mr. Howard was allegedly "harassing" a Park attendant. (E-mail of Kieishsha Garnes dated August 18, 2009 ("08/18/09 Garnes E-mail"), attached as part of Exh. U to Yi Decl.).

    E.   <u>Termination of the Permit</u>

    Sherri Rosenberg, the Parks Department's Deputy General Counsel, recommended to Mr. George that the plaintiff's permit be terminated because he was involved in a physical altercation with Mr. Ruiz on May 13, 2009, posted "things [] tennis staff found very objectionable in the language," and continued to be "very rude" to Parks Department officials and staff. (Def. Rule 56.1 Statement,

---

[7] The plaintiff disputes this in part because Mr. Kloth was unable to provide specifics about Ms. Garnes and Ms. Medina's complaints at his deposition. (Pl. Rule 56.1 Statement, ¶ 57).

¶ 61; Pl. Rule 56.1 Statement, ¶ 61; Deposition of Sherri Rosenberg dated Dec. 26, 2012 ("Rosenberg Dep."), attached as Exh. K to O'Neill Decl., at 13, 42-43, 60-61).   After hearing Mr. Howard's side and considering "the discourse at" the Park and the altercation with Mr. Ruiz, the Parks Department determined that Mr. Howard was not acting appropriately under the permit.   (Def. Rule 56.1 Statement, ¶ 62; Pl. Rule 56.1 Statement, ¶ 62; Kloth Dep. at 45).

On August 21, 2009, the Parks Department issued a Notice to Terminate the Permit effective immediately pursuant to section 10 of the permit which provides that it may be terminated "at any time for any reason."   (Def. Rule 56.1 Statement, ¶¶ 63-64; Pl. Rule 56.1 Statement, ¶¶ 63-64; Notice of Termination dated Aug. 21, 2009, attached as Exh. X to Yi Decl.; Permit, ¶ 10).   According to Mr. Howard, his permit was terminated because Ms. Rosenberg was "very unhappy" with him for raising "racial-based claims" and "various people at [the] Parks [Department] at various levels . . . did not like what [he] was saying to them in writing."   (Def. Rule 56.1 Statement, ¶ 65; Pl. Rule 56.1 Statement, ¶ 65, Howard Dep. at 58-59, 64).   According to Mr. George, the permit was terminated because of "pervasive operational issues dating back to 2008," including Mr. Howard's posting signs without the Parks Department's approval, arriving in the middle of the hour and demanding to use tennis courts while the public was using them, attempting to issue orders to Parks Department employees, storing personal property at the Park facility without authorization,

becoming involved in a physical altercation resulting in his arrest, and exhibiting aggressive behavior towards Parks Department employees.  (George Aff., ¶¶ 4-6).

   F.   City Commission on Human Rights

   On January 26, 2010, the plaintiff filed a complaint with the New York City Commission on Human Rights ("CCHR").  (Def. Rule 56.1 Statement, ¶ 66; Pl. Rule 56.1 Statement, ¶ 66).  The CCHR issued a decision on November 22, 2011, determining that there was no probable cause to believe that the Parks Department discriminated or retaliated against Mr. Howard.  (Def. Rule 56.1 Statement, ¶ 68; Pl. Rule 56.1 Statement, ¶ 68; CCHR Determination and Order After Investigation dated Nov. 25, 2011 ("CCHR Order"), attached as Exh. Z to Yi Decl.).

Discussion

   A.   Legal Standard

   Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); accord Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011).  A dispute regarding a material fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  A material fact is one that "'might affect the outcome of the suit under the governing law.'"  Roe v. City of Waterbury,

542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson, 477 U.S. at 248). In assessing whether there is a genuine issue of material fact, "a court must 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  Seeman v. Local 32B-32J, Service Employees Union, 769 F. Supp. 2d 615, 620 (S.D.N.Y. 2011) (quoting Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003)).

The moving party bears the initial burden of identifying those portions of the record that demonstrate "the absence of a genuine issue of material fact," Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), following which the opposing party must come forward with "specific facts showing that there is a genuine issue for trial," Wrobel v. County of Erie, 692 F.3d 22, 30  (2d Cir. 2012) (emphasis omitted) (quoting Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  The parties can support their claims with discovery materials, stipulations, affidavits, see Fed. R. Civ. P. 56(c)(1)(A); however, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F. 3d 244, 264 (2d Cir. 2009) (internal quotation marks omitted).

Local Civil Rule 56.1 governs factual statements on a motion for summary judgment.  "Each numbered paragraph in the statement of material facts . . . will be deemed to be admitted . . . unless specifically controverted by a correspondingly numbered paragraph

16

in the statement required to be served by the opposing party."
Local Civ. R. 56.1(c).   The opposing party shall, if necessary,
provide "additional paragraphs containing a separate, short and
concise statement of additional material facts as to which it is
contended that there exists a genuine issue to be tried."   Local
Civ. R. 56.1(b).   Further, "[e]ach statement by the movant or
opponent . . ., including each statement controverting any
statement of material fact, must be followed by citation to
evidence which would be admissible, set forth as required by Fed.
R. Civ. P. 56(c)."   Local Civ. R. 56.1(d).   Accordingly, the court
may "disregard[] any inappropriate portions of [the parties']
submissions, and . . . rel[y] [only] upon admissible evidence."
Epstein v. Kemper Insurance Companies, 210 F. Supp. 2d 308, 314
(S.D.N.Y. 2002).

     B.   Section 1981 Claims

     To the extent that Mr. Howard seeks to vindicate any right
under 42 U.S.C. § 1981, his claim is duplicative of the claims he
asserts under 42 U.S.C. § 1983 since each of the defendants he has
sued is a state actor.   See Jett v. Dallas Independent School
District, 491 U.S. 701, 735 (1989) (holding that "the express
'action at law' provided by § 1983 for the 'deprivation of any
rights, privileges, or immunities secured by the Constitution and
laws,' provides the exclusive federal damages remedy for the
violation of the rights guaranteed by § 1981 when the claim is
pressed against a state actor"); Whaley v. City University of New
York, 555 F. Supp. 2d 381, 400-01 (S.D.N.Y. 2008) ("To the extent

17

[the plaintiff] seeks to vindicate any independent right under 42 U.S.C. § 1981 [against state actors], he must do so via claims under § 1983."); see Hogan v. County of Lewis, New York, ___ F. Supp. 2d __, __, 2013 WL 936513, at *13 (N.D.N.Y. 2013) ("§ 1983, not § 1981, is the appropriate vehicle to pursue claims against state actors.").   "When a plaintiff alleges § 1981 and § 1983 claims for the same conduct, a court may dismiss the § 1981 claim or deem it merged with the § 1983 claim; the result, in practice, is the same." Wynder v. McMahon, No. 99 CV 772, 2013 WL 1759968, at *5 (E.D.N.Y. April 24, 2013) (dismissing plaintiff's § 1981 claim); see Booker v. Board of Education, Baldwinsville Central School District, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002) ("Because § 1981 provides no broader remedy against a state actor than § 1983 and since they merge into one another, the court need provide no further analysis on this point.").   Accordingly, I recommend that the plaintiff's § 1981 claims be dismissed. See, e.g., Hogan, ___ F. Supp. 2d at ___, 2013 WL 936513, at *13 (granting summary judgment for defendants on § 1981 claims because defendants are state actors); Carter v. City of Syracuse School District, No. 5:10-CV-690, 2012 WL 930798, at *17 (N.D.N.Y. March 19, 2012) (granting defendants' summary judgment motion and dismissing § 1981 claims brought against state actor).

B.   Section 1983

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . the deprivation of any rights,

18

privileges, or immunities secured by the Constitution and
laws, shall be liable to the party injured in an action
at law[.]

42 U.S.C. § 1983.  In order to establish a claim under § 1983, the
plaintiff must show that: (1) the defendant acted under color of
state law; and (2) the defendant's conduct or actions deprived
plaintiff of rights, privileges, or immunities guaranteed by the
Constitution.  See Washington v. County of Rockland, 373 F.3d 310,
315 (2d Cir. 2004).

Section 1983 "is not itself a source of substantive rights,
but a method for vindicating federal rights elsewhere conferred by
those parts of the United States Constitution and federal statutes
that it describes."  Baker v. McCollan, 443 U.S. 137, 144 n.3
(1979); see Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993)
("Section 1983 itself creates no substantive rights; it provides
only a procedure for redress for the deprivation of rights
established elsewhere.").  Mr. Howard brings an Equal Protection
Clause claim against Ms. Garnes and a First Amendment retaliation
claim against Ms. Rosenberg.

1.   Equal Protection Claim

"The Equal Protection Clause of the Fourteenth Amendment 'is
essentially a direction that all persons similarly situated should
be treated alike.'"  Brown v. City of Syracuse, 673 F.3d 141, 151
(2d Cir. 2012) (quoting Diesel v. Town of Lewisboro, 232 F.3d 92,
103 (2d Cir. 2000)); accord City of Cleburne v. Cleburne Living
Center, Inc., 473 U.S. 432, 439 (1985); see Harlen Associates v.
Incorporated Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)

19

("The Equal Protection Clause requires that the government treat all similarly situated people alike."). To establish a claim of selective treatment in violation of equal protection, a plaintiff must show both that "'(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Brown, 673 F.3d at 151-52 (alteration in original) (quoting Diesel, 232 F.3d at 103). The "[u]se of an impermissible consideration (such as race) must have been intentional, not merely negligent." Brisbane v. Milano, 443 F. App'x 593, 594 (2d Cir. 2011); see Pyke v. Cuomo, 567 F.3d 74, 78-79 (2d Cir. 2009) (plaintiff cannot survive summary judgment when he fails to "proffer enough evidence of discriminatory intent").

Mr. Howard argues that the prior tennis instructor, Don Sylva, was treated more favorably than he with respect to storage and tennis court reservations. (Pl. Memo. at 5-6; Pl. Rule 56.1 Statement, ¶ 7, 84; Howard Decl., ¶ 20). The plaintiff bears the initial burden of demonstrating that he is "'similarly situated in all material respects' to the individual[] with whom []he seeks to compare h[im]self," which requires a showing of "'a reasonably close semblance of facts and circumstances'" of the plaintiff and the comparator. Moccio v. Cornell University, 889 F. Supp. 2d 539, 574 (S.D.N.Y. 2012) (quoting Graham v. Long Island Rail Road, 230 F.3d 34, 39, 40 (2d Cir. 2000)); see Ruiz v. County of Rockland,

609 F.3d 486, 493-94 (2d Cir. 2010).  Mr. Howard has not addressed
how he is similarly situated to Mr. Sylva other than to point out
that they were both tennis professionals at the Park.

Even if the plaintiff and Mr. Sylva were similarly situated in
all material respects, Mr. Howard has not presented any admissible
evidence that they were treated differently.  See Ford v.
Consolidated Edison Co. of New York, Inc., No. 03 Civ. 9587, 2006
WL 538116, at *17 (S.D.N.Y. March 3, 2006) ("Absent concrete,
admissible evidence that similarly situated [comparators] were
treated differently under identical circumstances, Plaintiff's
discrimination claim must fail.").  Mr. Howard, relying on his own
declaration, contends that he was "aware" that Mr. Sylva was
permitted to store equipment inside a Park building.  (Howard
Decl., ¶ 20; Pl. Rule 56.1 Statement, ¶ 84).  "[W]here a party
relies on affidavits . . . to establish facts, the statements 'must
be made on personal knowledge, set out facts that would be
admissible in evidence, and show that the affiant . . . is
competent to testify on the matters stated.'"  DiStiso v. Cook, 691
F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4) and
citing Fed. R. Evid. 602).  "Merely being 'aware' of purported
facts is a far cry from having . . . personal knowledge."  Payne v.
Huntington Union Free School District, 219 F. Supp. 2d 274, 279
(E.D.N.Y. 2002) (finding affidavit based on affiant's awareness of
purported fact "not a sufficient proffer of record evidence to
create a genuine dispute of material fact in a motion for summary
judgment"); see Thomas v. Stone Container Corp., 922 F. Supp. 950,

957 (S.D.N.Y. 1996) (finding plaintiff's affidavit asserting his understanding of purported fact insufficient to create issue of fact).

In his declaration, Mr. Howard also contends that Ms. Garnes informed him that Mr. Sylva was "still storing his equipment in the Tennis Building and that he had a key to the storage room." (Howard Decl., ¶ 20; Pl. Rule 56.1 Statement, ¶ 84).  This is inadmissible hearsay evidence that cannot support opposition to a summary judgment motion.  See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985) (noting that party opposing motion for summary judgment cannot rely on inadmissible hearsay evidence); Crippen v. Town of Hempstead, No. 07 CV 3478, 2013 WL 1283402, at *11 (E.D.N.Y. March 29, 2013) ("[I]nadmissible hearsay cannot raise a triable issue of fact sufficient to defeat a motion for summary judgment." (internal quotation marks omitted)).  In fact, the only admissible evidence on this issue in the record indicates that Ms. Garnes was unaware that Mr. Sylva had a key. (10/14/08 Garnes E-mail; Garnes Dep. at 134).

The plaintiff's contention that the prior instructor was able to reserve a court by arriving five minutes before the hour is also based on inadmissible hearsay.  He contends that Hector Sauri, a supervisor at the Parks Department, told him that "it had always worked [] that the court was automatically reserved for the pro, and as along as the pro arrived five minutes before the hour, he would be given the court.  No posting, scheduling, calling or other

reserving was necessary." (Howard Decl., ¶ 16; Pl. Rule 56.1 Statement, ¶ 82). The plaintiff has not provided any sworn statement by Mr. Sauri and offers "no evidence of [this] conversation[] beyond [the plaintiff's] own inadmissible hearsay, since [the plaintiff] apparently failed to depose [the declarant]." Scaria v. Rubin, No. 94 Civ. 3333, 1996 WL 389250, at *10 (S.D.N.Y. July 11, 1996) (noting that court can reject argument based on alleged conversation because it should not consider inadmissible hearsay evidence on summary judgment).

Further, any differential treatment Mr. Howard alleges to have experienced cannot be attributed to race. While the plaintiff claims that Mr. Sylva is "Latino" (Pl. Rule 56.1 Statement, ¶ 84), Mr. Sylva is a "white non-native Hawaiian of Portugese descent." (CCHR Order at 3). Thus, the plaintiff is unable to show that he was treated differently because of his race. See Hengjun Chao v. Mount Sinai Hospital, 476 F. App'x 892, 896 (2d Cir. 2012) (finding plaintiff's failure to identify any material difference between his treatment and that of similarly situated person who do not fall within his protected class is fatal to discrimination claim); Williams v. New York City Department of Sanitation, No. 00 Civ. 7371, 2001 WL 1154627, at *17 (S.D.N.Y. Sept. 28, 2001) (no evidence of discriminatory intent because plaintiff cannot demonstrate that he was treated differently than persons outside relevant protected class).[8]

---

[8] The plaintiff also argues that because Ms. Garnes and her staff are "Black or Hispanic" and that he is "White," there is an inference of discrimination. (Pl. Memo. at 5). "The mere fact

Because Mr. Howard has not established his claim of disparate treatment on the basis of race, I recommend that the defendants' motion for summary judgment be granted as to the Equal Protection claim.

---

that plaintiff and defendants are of different races, standing alone, is simply insufficient . . . to allege racially motivated discrimination." Johnson v. City of New York, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009); see Trapp-Miley v. City of New York, No. 09 CV 3933, 2012 WL 1068102, at *13 (E.D.N.Y. Jan. 17, 2012) (finding record insufficient to survive summary judgment when "[t]he only circumstantial evidence relating to race is the fact that plaintiff and defendants are of different races").

He further contends that Ms. Medina's statement that "we don't want your White ass here" suggests discriminatory animus. (Pl. Memo. at 6). A single stray comment made by a non-decision maker does not demonstrate discrimination. See Dixon v. International Federation of Accountants, 416 F. App'x 107, 110 (2d Cir. 2011) ("We have long held that stray comments . . . [made by a non-decision maker] do not create an inference of discrimination."); Kouakou v. Fideliscare New York, ___ F. Supp. 2d ___, ___, 2012 WL 6955673, at *5 (S.D.N.Y. 2012) (collecting cases). Ms. Medina was a tennis attendant and not a decision maker (Def. Rule 56.1 Statement, ¶ 13; Pl. Rule 56.1 Statement, ¶ 13), and the plaintiff acknowledges that no other racial comments were directed at him by employees of the Parks Department (Def. Rule 56.1 Statement, ¶ 25; Pl. Rule 56.1 Statement, ¶ 25).

2. <u>Retaliation Claim</u>[9]

As an individual engaged in a contractual relationship with the City, Mr. Howard's First Amendment retaliation claim is analyzed under the standards applicable to public employees. <u>See Board of County Commissioners v. Umbehr</u>, 518 U.S. 668, 673, 676-79 (1996) (independent contractors' First Amendment retaliation claims are analyzed in same manner as claims by public employees); <u>Heusser v. Hale</u>, 777 F. Supp. 2d 366, 376-77 (D. Conn. 2011) (applying "public employee" test because plaintiff alleges to be in contractual relationship with city).

A three-part burden shifting analysis applies to First Amendment retaliation claims. <u>See Dillon v. Suffolk County Department of Health Services</u>, ___ F. Supp. 2d ___, ___, 2013 WL 208950, at *6 (E.D.N.Y. 2013). A public employee alleging such a claim bears the initial burden of demonstrating that:

---

[9] Mr. Howard's retaliation claim is brought under the First Amendment because "equal protection employment discrimination retaliation claims are not actionable under § 1983." <u>Marcotte v. City of Rochester</u>, No. 12-CV-6516, 2013 WL 2385163, at *4 (W.D.N.Y. May 29, 2013); <u>see</u> <u>Bernheim v. Litt</u>, 79 F.3d 318, 323 (2d Cir. 1995) ("Although claims of retaliation are commonly brought under the First Amendment and may also be brought under Title VII . . . , we know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination[,] [g]iven the availability of Title VII." (internal citation omitted)); <u>Klaes v. Jamestown Board of Public Utilities</u>, No. 11-CV-606, 2013 WL 1337188, at *14 (W.D.N.Y. March 29, 2013); ("[T]his Circuit does not recognize claims of employment discrimination or retaliation grounded in the Equal Protection Clause of the Fourteenth Amendment."); <u>see also</u> <u>Brown v. Research Foundation of SUNY</u>, No. 08-CV-592, 2009 WL 1504745, at *10 (N.D.N.Y. May 28, 2009) ("Because Title VII . . . contain[s] [its] own structure for private enforcement, Plaintiff may not bring a § 1983 claim premised upon the substantive rights provided by th[is] statute[].").

> (1) the speech at issue was 'made as a citizen on matters
> of public concern rather than as an employee on matters
> of personal interest'; (2) he . . . suffered an adverse
> [] action; and (3) 'the speech was at least a substantial
> or motivating factor in the [adverse . . . action].

Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (third

alteration in original) (internal citations omitted); see Dillon,

_ F. Supp. 2d at ___, 2013 WL 208950, at *6 .  If the plaintiff

establishes a prima facie case of retaliation, the burden then

shifts to the defendant to offer "some legitimate, non-retaliatory

rationale for its actions." Dillon, ___ F. Supp. 2d at __, 2013

WL 208950, at *6.  If the defendant does so, then the burden shifts

back to the plaintiff to demonstrate that "the 'legitimate reasons

offered by the defendant were not its true reasons, but were a

pretext for [retaliation].'"  Id. (alteration in original) (quoting

Patterson, 375 F.2d at 221).

The defendants argue that the plaintiff's First Amendment

claim should be dismissed because his speech cannot be

characterized as constituting speech on a matter of public concern.

(Memorandum of Law in Support of Defendants' Motion for Summary

Judgment ("Def. Memo.") at 16-20); see Singer v. Ferro, 711 F.3d

334, 339 (2d Cir. 2013) ("One limitation is that the First

Amendment protects a public employee from retaliation by his or her

employer for the employee's speech only if 'the employee sp[eaks]

[1] as a citizen [2] on a matter of public concern.'" (alterations

in original) (quoting Carcetti v. Ceballos, 547 U.S. 410, 418

(2006)); Wrobel, 692 F.3d at 28 ("Only if an employee's speech

. . . touches on a matter of public concern can a First Amendment

claim proceed.  Conduct that falls outside this class of activity is beyond the scope of the First Amendment's protections for public employee speech." (internal citations and quotation marks omitted)).  Determining whether "speech is on a matter of public concern is a fact-intensive inquiry; nevertheless it is a question of law for the court to decide." Wrobel, 692 F.3d at 28; see also Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir. 2011).  In making this determination, a court must examine "'the content, form, and context of a given statement, as revealed by the whole record.'" Jackler, 658 F.3d at 235 (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)).

        "A matter of public concern is one that 'relat[es] to any matter of political, social, or other concern to the community.'" Singer, 711 F.3d at 339 (alteration in original) (quoting Connick, 461 U.S. at 146).  That is, the speech must be "'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech." Jackler, 658 F.3d at 236 (quoting City of San Diego, California v. Roe, 543 U.S. 77, 83-84 (2004)).  On the other hand, "[s]peech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation" does not address a matter of public concern.  Id. (second alteration in original).

        Mr. Howard recognizes that "many of [his] complaints were purely private in nature;" however, he contends that when he complained that the "Parks[] [Department's] personnel were engaged

in a widespread practice of race discrimination against members of the general public," his speech was protected.  (Pl. Memo. at 14-15).  He refers to his August 2009 e-mails titled "further [the] Parks [Department] lawbreaking and racial discrimination against East River Park tennis."  (08/09/09 Howard E-mail; 08/05/09 Howard E-mail; 08/02/09 Howard E-mail).  In those e-mails, he complains of two incidents in which he alleges that staff at the Park permitted Mr. Ruiz to play in excess of the one-hour rule while "nonPOC" were made to wait.  (08/02/09 Howard E-mail, ¶ 6; 08/09/09 Howard E-mail, ¶ 2.2).  However, a plaintiff "may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run."  Miller v. City of Ithaca, No. 3:10-cv-597, 2010 WL 3809842, at *11 (N.D.N.Y. Sept. 22, 2010) (internal quotation marks omitted) (finding passing references to defendants' alleged discriminatory treatment in general conclusory terms does not transform personal grievance into matter of public concern); see Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) ("[R]etaliation against the airing of generally personal grievances is not brought within the protection of the First Amendment by the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern." (second alteration in original) (internal quotation marks omitted)); Ezekwo v. New York City Health & Hospitals Corp., 940 F.2d 775, 781 (2d Cir. 1991) (noting that "mere fact that one or two of [the plaintiff]'s comments could be construed broadly to implicate matters of public

concern does not alter the general nature of her statements").

In light of the record as a whole and in particular Ms. Howard's history with Mr. Ruiz, the August e-mails appear to be motivated overwhelmingly by his animosity toward Mr. Ruiz and not a concern for the public. See Singer, 711 F.3d at 339 (court may consider "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." (internal quotation marks omitted)); Sousa v. Roque, 578 F.3d 164, 175 (2d Cir. 2009) (noting that while speaker's motive is not dispositive, it is one factor to be considered). As early as October 2008, Mr. Howard accused Mr. Ruiz of teaching tennis without a permit and stated that he "hoped that [Mr. Ruiz] would make physical contact with [Mr. Howard] . . . because that would be the only way [Mr. Howard] could get action against [Mr. Ruiz]." (10/23/08 Howard E-mail, ¶5.2; 10/31/08 Howard E-mail, ¶ 6.1). According to Mr. Howard, he was frustrated that Mr. Ruiz was teaching tennis without a permit and "providing unsound instruction." (Howard Decl., ¶ 49). Tension between Mr. Howard and Mr. Ruiz escalated into a physical altercation on May 13, 2009, resulting in their arrest. (Def. Rule 56.1 Statement, ¶ 48; Pl. Rule 56.1 Statement, ¶ 48). After the May incident, Mr. Howard posted material at the Park characterizing Mr. Ruiz as "an illegal desperate perpetrator" and "a dangerous, desperate, unstable person." (Posting). Mr. Howard's August 2009 e-mails evince his animus towards Mr. Ruiz, referring to Mr. Ruiz as "the illegal unqualified uninsured uninvestigated Internet-advertising commercial tennis teacher who

perpetrated significant violence." (08/02/09 Howard E-mail, ¶ 4; 08/09/09 Howard E-mail, ¶ 3). In response to Mr. Howard's August e-mails, Ms. Garnes noted that there "is a constant battle [by] [Mr. Howard] against [M]r. Ruiz," that "[i]t seems that [Mr. Howard] is the harasser and is picking at [M]r. Ruiz on a personal level" (08/03/09 Garnes E-mail), and that "all you hear [from the plaintiff] is [C]arlos, [C]arlos, [C]arlos name" (08/18/09 Garnes E-mail).

Next, the defendants argue that even if the plaintiff were able to demonstrate that his speech was protected by the First Amendment, he cannot show a causal connection between the speech and the termination of his permit. (Def. Memo. at 20-21). However, "'[a] plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [] action.'" Dillon, __ F. Supp. 2d at __, 2013 WL 208950, at *15 (second alteration in original) (quoting Gorman-Bakos v. Cornell Cooperative Extension of Schnectady County, 252 F.3d 545, 554 (2d Cir. 2001)). The short time between Mr. Howard's August e-mails and his termination on August 21, 2009 may suggest a causal connection. See Dillon, __ F. Supp. 2d at __, 2013 WL 208950, at *15 (finding alleged retaliatory action taking place within "few weeks of the Plaintiff's protected activities" demonstrates causal connection sufficient to establish prima facie case).

Yet, even assuming that the plaintiff established a prima facie case of retaliation, the defendants have proffered

30

legitimate, non-retaliatory reasons for terminating his permit. The defendants contend that the plaintiff's permit was terminated because he "posed persistent operational issues and concerns during the operation of his Permit." (Def. Memo. at 9-10). Mr. Howard violated the terms of his permit and the Parks Department's rules by failing to provide the Parks Department's personnel sufficient notice of his teaching schedule (03/31/09 Howard E-mail), storing equipment at the Park without authorization (Def. Rule 56.1 Statement, ¶ 32; Pl. Rule 56.1 Statement, ¶ 32), and posting materials on the Parks Department's premises without permission (Def. Rule 56.1 Statement, ¶ 55; Pl. Rule 56.1 Statement, ¶ 55; Garnes Dep. at 49-52; 08/03/09 Garnes E-mail). (Def. Memo. at 9-10; George Aff. ¶ 4). In addition, the Parks Department received complaints that Mr. Howard was aggressive and argumentative with the Park staff and, "most significantly," Mr. Howard was involved in a physical altercation on the Park tennis court with another patron, resulting in his arrest. (Def. Memo. at 10; George Aff. ¶¶ 5-6; Def. Rule 56.1 Statement, ¶¶ 48, 57, 59; Pl. Rule 56.1 Statement, ¶¶ 48, 59; Kloth Dep. at 36-37; 08/18/09 Garnes E-mail). The defendants have met their burden to "show that they would have taken the same adverse action in the absence of [the plaintiff's] protected speech." Dillon, __ F. Supp. 2d at __, 2013 WL 208950, at *16; see Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977); Tucker v. New York City, 376 F. App'x 100, 103 (2d Cir. 2010).

The plaintiff acknowledges that the defendants have met their

burden of proffering legitimate reasons for terminating his permit (Pl. Memo. at 7), but argues that their reasons are pretextual (Pl. Memo. at 11-14).  However, Mr. Howard's attempts to dispute the Parks Department's stated reasons are nonsensical, unsupported by evidence, and based solely on his own conclusory allegations.  See Hongyan Lu v. Chase Investment Services Corp., 412 F. App'x 413, 417 (2d Cir. 2011) (rejecting plaintiff's argument that defendant's proffered reason was pretext because she offered no evidence besides her own conclusory allegations).  The plaintiff contends that he was not delinquent in scheduling because he was not required to provide his tennis schedule to the Park in advance. (Pl. Memo. at 11-12).  His argument is based on the fact that the Parks Department did not respond to his March 31, 2009 e-mail in which he asserts that "[t]here is no scheduling to be done between me and the [P]ark." (Pl. Memo. at 12; 03/31/09 Howard E-mail, ¶ 9).  But his permit provides that "[a]ll appointments [for the Park's tennis court] must be reserved at least one day in advance." (Permit, ¶ 7).  The parties do not dispute that the permit is a contract (Permit, ¶ 38; Pl. Memo. at 1; Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment at 2), and "under New York law, a contract cannot be modified without the mutual assent of each party," Larson v. Eney, 741 F. Supp. 2d 459, 465 (S.D.N.Y. 2010); see Burnside Coal & Oil Co. v. City of New York, 135 A.D.2d 413, 415, 521 N.Y.S.2d 703, 705 (1st Dep't 1987) ("[P]laintiff may not unilaterally modify the contract terms."); see also RJ Capital, S.A. v. Lexington Capital Funding III, Ltd.,

No. 10 Civ. 25, 2013 WL 1294515, at *8 (S.D.N.Y. March 30, 2013) ("'[U]nilateral expression[s] of one party's postcontractual subjective understanding of the terms of the agreement . . . [are] not probative as an aid to the interpretation of the contract.'" (second and fourth alterations in original) (quoting <u>Faulkner v. National Geographic Society</u>, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006))); <u>Murray Walter, Inc. v. Sarkisian Brothers, Inc.</u>, 183 A.D.2d 140, 146 589 N.Y.S.2d 613, 616 (3d Dep't 1992). Here, the Parks Department never agreed to waive the clause requiring advance scheduling.

As to storing equipment at the Park without authorization, the plaintiff argues that this issue was "resolved" because he eventually removed his equipment after the Parks Department directed him to do so and he did not subsequently store his equipment on Park premises. (Pl. Memo. at 12). However, the plaintiff acknowledges that he did not have permission to store his equipment at the Park in the first place, and rectifying his violation of the Parks Department's rules does not negate the original violation.

In response to the charge of displaying unauthorized flyers, Mr. Howard claims that "there is barely any evidence in the record concerning [] alleged 'impermissible postings.'" (Pl. Memo. at 12). However, during the plaintiff's deposition, he admitted to having received a Notice to Cure which informed him that he could not post signs on the fence and tennis court. (Howard Dep. at 38). Further, Mr. Ruiz and Ms. Garnes testified about signs posted by

Mr. Howard around the Park that negatively characterized Mr. Ruiz and Ms. Medina.  (Ruiz Dep. at 95-96; Garnes Dep. 49-51; Posting).

The plaintiff argues that all evidence of his "rude and argumentative behavior" was in connection with his complaints of race discrimination.  (Pl. Memo. at 12).  But, according to Mr. Kloth, when Mr. Howard was asked to follow the Parks Department rules, he would become "very difficult and abusive" (Kloth Dep. at 37), and he was "rather abusive to [Ms. Garnes] and the other [attendant]" (Kloth Dep. at 36).  For example, when Ms. Garnes requested that Mr. Howard move his bicycle that he parked on the tennis courts, he became "combative."  (Advocate Office Investigation Report at 1).

Finally, Mr. Howard contends that the May 2009 altercation with Mr. Ruiz could not be a reason for terminating his permit because the Parks Department did not investigate the incident to determine who the aggressor was and permitted him and Mr. Ruiz to use the Park tennis courts after the incident.  (Pl. Memo. at 12-13).  Yet the fact that the Parks Department did not immediately terminate the plaintiff's permit after the altercation and instead attempted to continue working with him does not suggest retaliatory animus.  See Williams v. New York City Health & Hospitals Corp., No. 11 Civ. 9456, 2012 WL 5506128, at *6 n.1 (S.D.N.Y. Nov. 13, 2012) (finding no retaliation even though plaintiff was not terminated immediately after violating "last chance agreement" because plaintiff had lengthy disciplinary history).

In sum, the undisputed evidence demonstrates that the

34

plaintiff violated various Parks Department's rules, and the plaintiff has not proffered evidence sufficient to create a dispute over whether the defendants' reasons for terminating his permit were pretextual. Accordingly, the defendants' summary judgment motion on the First Amendment retaliation claim should be granted.

### 3.  Municipal Liability

In the absence of a viable constitutional violation or a showing that any such violation occurred pursuant to an official policy, practice, or custom, there can be no municipal liability. Barreto v. County of Suffolk, 455 F. App'x 74, 75-76 (2d Cir. 2012). As discussed, Mr. Howard has failed to demonstrate any constitutional violation. Moreover, he has not produced any evidence of a discriminatory or retaliatory practice, policy, or custom that caused his alleged harm. Accordingly, the plaintiff's claims against the City should be dismissed.

### Conclusion

For the foregoing reasons, I recommend that the defendants' motion (Docket no. 58) be granted and the plaintiff's complaint be dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Jesse M. Furman, Room 2202, 40 Foley Square, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.

Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          July 3, 2013

Copies mailed this date to:


Michael G. O'Neill, Esq.
30 Vesey St.
New York, NY 10007

Lesley B. Mbaye, Esq.
New York City Law Department
100 Church St.
New York, NY 10007

36